**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MATTHEW TODD STUMP,**

**Plaintiff,**

**v.**

        **Civil Action No.: 2:15-CV-76**
        **(JUDGE BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Matthew Todd Stump ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commission of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

On September 25, 2012, Plaintiff filed a Title II application for a period of disability and DIB, alleging disability beginning May 21, 2012. Plaintiff's claims were denied on January 3, 2013, at the initial level and on January 23, 2013, at the reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Peter Jung ("ALJ") held on March 10, 2014, and at which Plaintiff, represented by Jan Dils generally, and at the hearing by non-attorney representative Shannan Hinzman, and Nancy Shapero, an impartial Vocational

Expert ("VE") testified. On April 9, 2014, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals Council and, on January 13, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

At the administrative hearing held on March 10, 2014, Plaintiff testified that he was born on October 15, 1966 (R. 32), making him forty-seven (47) years old at the time of the hearing. Plaintiff obtained his GED, the highest level of education he has completed. Id. Plaintiff resides with his wife and son, who is in school (R. 260).

### B. Medical History Summary

#### 1. Medical History prior to May 21, 2012

An MRI on Plaintiff's cervical cord and spine on November 6, 2003 showed sparring at C4-5 (R. 301). Plaintiff's spinal cord was observed to be mildly indented by a moderate size right paracentral disc protrusion at C5-6. Id. A similar paracentral disc protrusion was also observed at C6-7, without direct indentation of the spine. Id. Moderate central canal stenosis was also observed at C4-5 and C6-7. Id. Chiropractic Treatment Records from Johnson Chiropractic Clinic from August 23, 2011 to April 13, 2012 generally reflect ongoing treatment and issues with his cervical, dorsal, lumbar, and lumbosacral spine (R. 223).

Plaintiff was admitted to the hospital in October 2011 after a venous ultrasound revealed evidence of deep (left popliteal) vein thrombosis in Plaintiff's left leg (R. 253). Plaintiff was started on Warfarin therapy, began wearing support stockings, and reported feeling better at the end of October 2011 (R. 288). However, his leg was still warm to the touch and often swelled

with prolonged standing (R. 288, R. 290). In November 2011, Plaintiff complained of night sweats, dizziness, and high blood pressure (R. 287) In addition to Lasix, Toprol, and Lisinopril, Plaintiff also began taking Xanax for Generalized Anxiety Disorder noted by Dr. Humphrey (R. 217). On April 3, 2012, Plaintiff reported frequent headaches, for which he was prescribed Vicodin (R. 278, 282).

## 2. Medical History from May 21, 2012

On May 21, 2012, Plaintiff had to leave work due to lightheadedness and dizzy spells (R. 279). Emergency Medical Services transported him to the hospital, where an EKG conducted at that time was normal. Id.

On June 5, 2012, Plaintiff complained again of dizziness, for which an MRI was done on June 26, 2012 (R. 249). The MRI showed mild microvascular ischemic changes in Plaintiff's brain, a chronic infarct in the right cerebellar hemispbauhere, and a chronic lacunar infarct in the left cerebellum. Id. Plaintiff was diagnosed with a cerebral embolism with cerebral infarction, late effects of cerebrovascular disease (ataxia), and primary hypercoagulable state (R. 218).

On June 26, 2012, a carotid Doppler ultrasound was completed, showing largely normal limits for results and "no hemodynamically significant carotid arterial stenosis" (R. 251). Under "Findings," it was noted that "[d]ue to patient large body habitus, there is [sic] some technical difficulties." Id.

On August 2, 2012, Plaintiff was referred to Dr. Charles Levy for review of this abnormal MRI of his brain (R. 227). Dr. Levy noted that Plaintiff complained of throbbing headaches and dizziness that began about 3 months ago, with no known injury, and usually began in the occipital region travelling superiorly to the frontal region of the brain. Id. Plaintiff's headaches were "aggravated with nothing in particular, and alleviated with medications and rest." Id.

Plaintiff also complained of dizziness, vision changes, and speech difficulty; he denied problems with gait, coordination, or bowel and bladder dysfunction at that time. Id. The MRI showed a "small encephalomalacic focus in the right cerebellar hemisphere, possibly from chronic ischemic disease, possibly post-traumatic." Id. Dr. Levy ordered an MRI of Plaintiff's brain including MRA of the cerebral vasculature, and a referral to neurology (R. 230).

On August 9, 2012, Plaintiff had a Magnetic Resonance Angiography (MRA) pursuant to Dr. Levy's orders (R. 231). Dr. Meyers noted, in relevant part for the MRA, "[n]o significant abnormalities identified to explain the right cerebellar infarct; consider evaluation of the aortic arch and proximal cervical arteries." Id. For the MRI, Dr. Meyers noted primarily normal findings, excepting "a chronic 20 x 12 mm area of encephalomalacia in the right inferior cerebellum consistent with an old infarct," a "tiny 3 mm punctuate are of focal volume loss in the left cerebellum that may be a small old lacunar infarct," unchanged since the prior study (R. 233).

Subsequently, on August 22, 2012, Plaintiff saw Dr. Jay Bauerle, M.D. pursuant to Dr. Levy's neurology referral. (R. 235). At this point, Plaintiff reported taking Vicodin (hydrocodone-acetominophen) for pain, Lasix, Lisinopril, Pravastatin, Toprol, Warfarin, and Xanax for anxiety (R. 236). Dr. Bauerle's assessment was "cerebral embolism; with cerebral infarction, primary hypercoagulable state, and late effects of cerebrovascular disease, ataxia." Id. He noted that:

> [Plaintiff's] embolic appearing right cerebellar infarct and the left insular collection of smaller infarcts, as seen on MRI, are concerning for a cardiac source of emboli. The The history of deep venous thrombosis is suggestive of a hypercoagulable state. Were the patient to have a patent foramen ovale, which occurs in ~ 25% of the population, venous thrombi could cause cerebral infarction. The patient needs a transesophageal echocardiogram, a laboratory workup for thrombophilia and a hematology consultation, as laboratory tests are not available for all hypercoagulable disorders. Many hypercoagulable disorders are familial, so diagnosis of such an issue in one patient can be

valuable preventatively for their family members. After the above evaluations, consider MR angiography of the carotid and vertebral arteries.

Id. Dr. Bauerle ordered a transesophageal echocardiography along with a number of laboratory tests in order to confirm or rule out potential causes. Id. Dr. Bauerle considered both physical structural abnormalities – specifically, a patent foramen ovale - and blood clotting disorders as potential causes (noting Plaintiff's family history of stroke[1] and Plaintiff's personal history of deep vein thrombosis in conjunction with Plaintiff's current brain diagnoses). Id.

An echocardiogram was completed on September 21, 2012, which Dr. Humphrey opined was of "poor quality," lacked 2-D measurements or Doppler study, and was thus limited (R. 248). Subsequently, a transesophageal echocardiogram including Doppler study was completed on October 5, 2012, which showed primarily normal results, excepting "mild dilation of the left atrium" and "mild mitral regurgitation," and "[n]o evidence of any significant valvular heart disease or intramural thrombus" (R. 246).

### 3. *Medical Reports/Opinion*

#### a. *Disability Determination Explanation at the Initial Level*

On November 12, 2012, Dominic Graziano, M.D. opined Plaintiff was "Partially Credible . . . mer [Medical Evidence of Record] does not support degree of alleged impairments," and that "Normal mental status does not support his claims of limitations in this domain" (R. Under "Weighing of Opinion Evidence," the report stated "[t]here is no indication that there is medical or other opinion evidence" (R. 60). Dr. Graziano concluded Plaintiff had the following exertional limitations: occasionally lift 50 pounds; frequently lift 25 pounds; stand, walk, or sit 6 hours in an 8-hour work day; and unlimited pushing and pulling (R. 60). Dr. Graziano concluded Plaintiff had the following postural limitations: occasionally climb

---

[1] "Patient's mother had a stroke before she turned 60 years old. His sister had a MI prior to being 60 years old" (R. 235).

ramps/stairs; never climbing ladders/ropes/scaffolds; never balancing; occasionally stooping, kneeling, crouching, and crawling, which he supported with "small cva with wide based atalgic gait, mildly unsteady gait" (R. 61). Dr. Graziano concluded Plaintiff had the following environmental limitations: Unlimited extreme cold, extreme heat, wetness, humidity, noise, and fumes etc.; avoid even moderate exposure to vibration; and avoid all exposure to hazards (machinery, heights, etc.), and could perform Light work. Id.

On December 29, 2012, Debra Lilly, Ph.D. listed the following Medically Determinable Impairment Diagnoses: 1) Other Disorders of the Nervous System: Priority – Primary, Severity – Severe; 2) Organic Brain Syndrome, Priority – Secondary, Severity – Non Severe; 3) Anxiety Disorders: Priority: Other, Severity: Non Severe," none of which she found to satisfy A, B, or C criteria (R. 58). Dr. Lilly found mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Lilly further opined "The claimant has a history of CVFA with reports of cognitive issues. These are not apparent upon testing. His activities of daily living do not reflect significant difficulties secondary to a mental disorder. Non Severe" (R. 59).

### b. Neuropsychological Evaluation / Consultative Evaluation Report

On December 11, 2012, licensed psychologist Cynthia Spaulding conducted a neuropsychological evaluation of Plaintiff (R.259). At this time, Plaintiff reported loss of balance, severe headaches, and perspiration. Id. In her Consultative Evaluation Report, Dr. Spaulding observed the following: Plaintiff had poor hygiene and "fair" grooming. Id. Plaintiff had an impaired gait, and his psychomotor activity level was mildly retarded. Id. Plaintiff's affect was "mildly restricted" (reduced range of emotional expression) and his mood was neutral. Id. Spaulding described Plaintiff's speech as "rambling," with "evident" word retrieval

difficulties. Id. Plaintiff appeared older than his chronological age. Id. Plaintiff's immediate and recent memory were both unimpaired; but his remote memory was impaired. (R. 262).

Plaintiff's scores on the Wechsler Adult Intelligence Scale for Adults – Fourth Edition (WAIS-IV) were in the low to average range ("judgment was mildly impaired based on the claimant obtaining a standard score of seven on the Comprehension Subtest of the WAIS-IV") (R. 262). Plaintiff's attention span was within normal limits, based on a standard score of eight on the Digit Span Subtest of the WAIS-IV. Id. Plaintiff was cooperative, had appropriate eye contact, and social functioning was normal. Id.

Dr. Spaulding diagnosed "Axis I: Cognitive Disorder, NOS" [not otherwise specified] based on "word retrieval difficulties, difficulty recalling details of his personal history, reported symptoms and medical evidence of a prior stroke" (R. 263). Dr. Spaulding diagnosed "Anxiety Disorder, NOS" based on "panic attacks in which he struggles to breathe, has chest pain and becomes dizzy." Id. Dr. Spaulding listed Plaintiff's prognosis as "Guarded." Id.

### c. Disability Determination Explanation at the Reconsideration Level

On January 18, 2013, Pedro Lo, M.D. signed an assessment that was identical to the previous assessment by Dr. Graziano, differing only in 1) his addition of the following note: "mer in the file reviewed. Affirm [Dr. Graziano's] prior assessment of 11/12/12," and 2) finding Plaintiff could perform Medium work  (R. 73).

On January 22, 2013, G. David Allen, Ph.D. likewise signed an assessment identical to Dr. Lilly's, differing only in his addition of the following note: "Following review of all pertinent evidence in this file, the assessment completed on 12/29/2012 is affirmed as written" (R. 70).

### d. *Physical Residual Functional Capacity Questionnaire*

On February 17, 2014, treating physician Frederick Humphrey completed an RFC Assessment for Plaintiff (R. 302). While not all of the things Dr. Humphrey wrote were legible, Dr. Humphrey listed the following diagnoses: 1) cerebellar infarct, 2) chronic DVT [deep vein thrombosis] in left leg; 3) generalized anxiety disorder, 4) [indeterminable], 5) obesity, 6) chronic cephalgia, 7) hypertension, 8) hypothyroidism, 9) VI lower extremities. Id. Prognosis was listed as "poor." Id. Symptoms listed included "Recurrent vertigo, esp. sitting & standing – chronic headaches, chronic left leg pain." Id. Dr. Humphrey identified pain experienced by Plaintiff as "mild pain left leg – main problems are headaches – (Severe at times) & recurrent vertigo, present most of the time & difficulty walking, problems with gait and balance." Id. Dr. Humphrey identified clinical findings and objective signs "Difficulty standing, swollen left leg – obese 300 lbs." Id. Dr. Humphrey noted a good response to Coumadin, Lisinopril, Prilosec, and Prevastatin; a fair response to Xanax and Topamax, and noted another medication for swelling of legs. Id. Dr. Humphrey opined that Plaintiff's impairment lasted or could be expected to last at least twelve months. Id.

Dr. Humphrey further opined that Plaintiff was not a malingerer, that emotional factors did not contribute to the severity of Plaintiff's symptoms and functions limitations, that Plaintiff's anxiety affected his physical condition, and impairments were reasonably consistent with the symptoms and functional limitations (R. 303). He opined that Plaintiff's experience of pain or other symptoms was severe enough to interfere constantly with attention and concentration, and that Plaintiff was incapable of even low stress jobs due to a combination of factors, including suffering from "marked anxiety - very nervous and stressed most of the time," as well as "poor concentration" (R. 304).

Dr. Humphrey opined that Plaintiff could walk "1/2 block only" without rest or severe pain; sit for 10 minutes at one time before needing to get up; stand for 10 minutes before needing to sit down or walk around; sit/stand/walk for two hours in an 8-hour working day; and walk for two minutes every 30 minutes (R. 304-305). Plaintiff would need to take two to three unscheduled breaks per 8-hour workday, resting five minutes before returning to work. (R. 305). Dr. Humphrey opined that Plaintiff could occasionally lift or carry 10 pounds or less, rarely lift or carry 20 pounds, and never lift or carry 50 pounds. Id. Plaintiff could rarely look up or down; occasionally turn head left or right, and frequently hold his head in a static position (R. 306). He could never stoop, crouch, or climb ladders; and rarely twist or climb stairs. Id. Plaintiff had significant limitations with reaching, handing, or fingering; he could use hands and fingers 25% of the time, and his arms 10% of the time. Id. Dr. Humphrey described other limitations as "Does suffer mark [sic] stress & anxiety, problem working around crowds, following commands, & time constraints; He tires easily & would have trouble working full time; He is unable to be gainfully employed on a full time basis" (R. 307).

### C. Testimonial Evidence

At the administrative hearing held on March 10, 2014, Plaintiff testified that he was born on October 15, 1966 (making him forty-seven (47) years old at the time of the hearing) (R. 32). Plaintiff obtained his GED, the highest level of education he has completed. Id.

Plaintiff next testified regarding his work history. Plaintiff's last job was with Simonton Building Products, where he was employed from April of 1999 through May of 2012 – almost thirteen (13) years (R. 33). Plaintiff described his typical workday as "taking big stacks of vinyl off of a rack and loading them on a saw, running drill, using the saw, measuring pieces as you cut them out, rubbing frames for windows" (R. 33). Plaintiff testified that he would stand and

walk eight out of eight hours in a workday, and that the typical weight of items he lifted was between 25 and 50 pounds (R. 34). Plaintiff is right-handed, five feet eight inches (5'8") tall, and weighs three hundred (300) pounds. Id.

Plaintiff last worked on May 21, 2012, when he experienced an episode at work wherein he "got real lightheaded and stumbled," and had high blood pressure, which continued along with the dizziness (R. 35). Emergency personnel at Plaintiff's place of employment administered an EKG, which was normal, but personnel took Plaintiff home. Id. Since then, Plaintiff has been seeing Dr. Humphrey, his primary care doctor, once per month on average. Id. Plaintiff has collected disability payments following the incident based on long-term disability. Id. See also (R. 172).

Plaintiff next testified regarding his treatment. He advised Dr. Humphrey "tried putting [Plaintiff] on an anti-motion or a motion sickness pill to see if that would steady me and that didn't help" (R. 37). Plaintiff has not had any surgeries, physical therapies, pain injections, or pain blocks since May of 2012. Id. Plaintiff's conditions have been managed with medication, from which he experiences no side effects. Id.

Plaintiff testified that the dizzy spells are the worst of his impairments (R. 37). Plaintiff reported experiencing episodes of dizziness "just about everyday" and without warning: "It'll happen all of a sudden and I'll get real weak in my knees" Id. The dizzy spells do not typically last more than ten to fifteen (10-15) seconds. Plaintiff reported having fallen "like 13 or 14 times" from dizzy spells since 2012, though those falls have not required emergency treatment to date (R. 37). The dizzy spells are accompanied by painful headaches that require medication and between two (2) to five (5) hours of sleep to treat:

> Q: Have you told Dr. Humphrey about them?
> A: Yes.

Q: What has he told you about them?

A: He thought that I should have been getting better, but that is why – is causing the dizzy spells is from the stroke.

Q: Okay. So you said you have these dizzy spells everyday. How often during a typical day and how long do they last?

A: Well usually they last not very long, but I'll get a real bad headache with it.

Q: Okay. So how long is not very long? Let's kind of break it down a little bit. You have – you get a spell of being dizzy?

A: Yeah, 10 –

Q: You're talking about –

A: -- 10-15 seconds

Q: Okay. So they last about 10 to 15 seconds. And then afterwards you get a headache?

A: Yeah, I'll have – I'll – it's like you can feel it walking up the back of my head and I'll get the headache and I'll go in and take something for the pain and then I'll go in and I'll lay down.

Q: How long does that headache last once you take your medication and lay down?

A: Well, usually I have to go to sleep in order for the headache to stop.

Q: Okay. So how long typically are you laying down sleeping before that goes away?

A: It can be anywhere from two to five hours.

Q: And how often in a typical day do you have those dizzy spells? Just once a day?

A: Sometimes once, sometimes twice. I don't think I've ever had more than two.

Q: Okay. And that happens everyday [sic]?

A: Just about – yeah, just about everyday [sic].

Q: Have they adjusted your blood pressure medication?

A: My blood pressure had read fine every time.

Q: So what medications are they adjusting?

A: None – none of my medications have been adjusted.

(R. 37-39). Plaintiff testified that in terms of medication, he takes Topamax, Coumadin, Xanax, Lasix, Lisinopril, Pravastatin, and Prilosec (R. 40). Plaintiff testified that he does not drive unless he absolutely has to. Id. Although he has not had any accidents while driving since 2012, he has had dizzy spells while driving and is concerned he may hurt someone. Id. When this happens, Plaintiff testified all that he can do is pull over to the side of the road and sit still. Id. Plaintiff has discussed with his doctor "maybe taking my license because [he does]n't want to hurt anybody." Id.

Plaintiff also testified about problems with his neck and back, reporting a herniated disc that causes periodic loss of use of, and feeling in, his left arm (R. 41). Plaintiff reports that these

symptoms are worse when he puts more stress and strain on it, and better when he does not use it much. Id. Plaintiff next discussed problems standing or walking. Id. He testified that he was able to stand or walk for approximately fifteen (15) to twenty (20) minutes before he would be "pushed to his limit" and have to sit down and rest for about an hour (R. 41-42). Problematically, however, Plaintiff's back and neck begin to hurt when he sits for longer than fifteen (15) to twenty (20) minutes. Id.

Plaintiff next testified about his daily activities and typical day. Plaintiff testified that he will watch television or read books if he can, but that his ability to do those things is affected by his daily headaches (R. 42). Plaintiff used to enjoy working on cars or going to visit family, which he cannot do much anymore because he is afraid to drive unless it is absolutely necessary. Id. Plaintiff reports that his wife has indicated to him that he has significant memory problems, and that he feels depressed because he is "used to working and this isn't . . . something I'm used to and the health thing just seems to get worse and worse." Id.

The ALJ then questioned Plaintiff regarding additional health problems. Plaintiff testified that he is completely blind in his left eye, and has "okay" vision in his right eye, except for when reading (R. 44-45). Plaintiff reported having problems with deep vein thrombosis in his lower extremities in October 2011, but that he now takes blood thinners to keep that in check (R. 45). The ALJ asked Plaintiff if he "get[s] along with other people," and Plaintiff responded that he did. Id.

### D.  Vocational Evidence

Ms. Nancy Shapero, an impartial vocational expert, also testified at Plaintiff's administrative hearing, The VE classified Plaintiff's work as "a [inaudible] worker in the window factory" classified as "medium work up to an SVP of 3; no transferrable skills" (R. 47).

The ALJ then asked the VE the following hypothetical:

Let's assume this hypothetical individual's date of birth is October 15, 1966; this individual has a GED with the following limitations: okay. This individual can carry – lift and carry 20 pounds occasionally/10 pounds frequently; standing and walking six hours; sitting six hours; posturally never climbing ladders, ropes, scaffolds; never balance; only occasional for the following: climbing ramps, stairs, stooping, kneeling, crouching, and crawling; visually this individual has the limited depth perception secondary to his or her being blind in one eye; environmentally, this individual must avoid or never work in the heights, machinery, or hazards; avoid even moderate exposure to vibration; avoid concentrated exposure to extreme cold, extreme heat, wetness, and noise; psychologically, this individual is limited to simple, repetitive, routine tasks. Based on those restrictions, can this hypothetical individual perform any of the – or actually only one of the claimant's past work?

(R. 47). The VE stated that such an individual would not being able to perform the past work but could perform other types of work: (1) hand packer, (2) sorter, and (3) janitorial (R. 48). The ALJ then asked a second hypothetical:

Let me give you another hypothetical. Let's – everything else stays the same except we change the exertional requirement to -- or limitation to 10 pounds occasionally /less than 10 pounds frequently; standing and walking two hours; sitting six hours; and then [INAUDIBLE] postural, visual, environmental, and psychological. Would there be any jobs in the national and/or regional economy?

(R. 48-49). The VE testified that the job of (1) hand packer would still be available, in addition to (2) addresser and (3) inspector. The ALJ then asked a third hypothetical:

Okay. Let's -- this is a new hypothetical or -- it's based on Exhibit 5F, medical source statement from Dr. Humphrey. We are going to leave the same psychological limitation of simple, repetitive, routine tasks, but physically, this hypothetical individual can sit about two hours, standing and walking about two hours both in an eight-hour workday; lifting up to 10 pounds occasionally/20 pounds rarely; rarely twisting; rarely climbing stairs; never stoop; never crouch; never squat; never climbing ladders; manipulatively, this individual can use 10% bilateral upper extremities for reaching/25% for both handling and fingering. Based on those restrictions, can this hypothetical individual perform any jobs in the nation -- or would there be any jobs in the nation and/or regional economy?

(R. 49). The VE testified that, based on those restrictions, there would be no jobs in the nation or regional economy that such a hypothetical individual could perform. Id. Plaintiff's representative then examined the VE, posing a fourth hypothetical:

> Q:  Ms. Shapiro, if we took the judge's first and second hypothetical and added that a person would need to be able to change their position about every 10 to 15 minutes; they would need to be able then pretty much to shift at will; and they would need two to three unscheduled breaks a day for up to about five minutes at a time to deal with issues of pain. Would that impact any of the jobs you listed in the first and second hypothetical?
>
> A:  Yes, ma'am.
>
> Q:  In what way please?
>
> A:  They would be ruled out.
>
> Q:  And if a person missed as many as two to three times a month each month, how would that level of absenteeism impact one's ability to maintain unskilled work?
>
> A:  If that was on a consistent basis, it would rule out work in my opinion.

(R. 50).

### E.  Report of Contact Forms, Work History Report & Disability Reports

#### 1.  Work History Report

On October 8, 2012, Plaintiff filled out a work history report. In the report, Plaintiff listed his prior work as "window maker" with Simonton Windows, from April 26, 1999, to present (R. 173).[2] Plaintiff described his work as "runn[ing] a power saw or weld[ing] all day," eight to twelve (8-12) hours per day, five to six (5-6) days per week. Id. Per day, this job required Plaintiff to walk for eight to twelve (8-12) hours, stand for eight to twelve (8-12) hours, climb for one (1) hour, crouch for one (1) hour per, reach for eight to twelve (8-12) hours, and handle, grab, or grasp big objects for eight to twelve (8-12) hours. Id. Plaintiff had to lift vinyl sticks weighing fifty (50) pounds or more and carry them approximately five (5) feet to the saw continuously throughout his workday. Id.

---

[2] Plaintiff also reported working at Wings Ole from February 1997 – February 1999, further details of which are omitted from this review as non-applicable to the issues at hand.

### 2. *Disability Report*

Plaintiff filled out a disability report on October 1, 2012 (R. 162). He indicated that his ability to work was limited by headaches, dizziness, high blood pressure, neck and back troubles, stroke on the base of the brain, high cholesterol, vertigo, anxiety, and motion sickness, which also cause him pain and other symptoms (R. 164). Medications listed at this time included Hydrocodone for pain, Ibuprofen for headaches, Lasix for fluid retention, Lisinopril for blood pressure, Meclizine for motion sickness, Pravastatin for cholesterol, Troprol for blood pressure, Warfarin for blood thinner, and Xanax for nerves (R. 167).

A second disability report dated January 16, 2013 noted largely no changes, except that Plaintiff was "unable to walk or stand for any amount of time[, g]ets confused easily[, and m]ust be reminded to take care of household tasks" (R. 193). Medications listed at this time included Lisinopril and Toprol for blood pressure, Warfarin for blood thinner, and Xanax for nerves. Id.

On February 5, 2013, a third and fourth disability reports were completed, one each for field office and appeals. The appeals disability report noted increased anxiety beginning January 1, 2013, and more back and neck problems (R. 199). Plaintiff also noted that personal tasks now take longer to complete, he only showers once or twice per week, he cannot stand or walk for any amount of time, he is unable to drive, he has difficulty communicating and concentrating on completing household tasks (R. 200). Medications listed at this time included Lisinopril and Toprol for blood pressure, Warfarin for blood thinner, and Xanax for nerves. Id. In the "Remarks" section, Plaintiff additionally listed Furosemide for fluid retention, Metoprolol ER for blood pressure, Pravastatin for cholesterol, and Alprazolam for anxiety (R. 201).

### F. Lifestyle Evidence

#### 1. Adult Function Report

On October 8, 2012 Plaintiff completed an adult function report, listing "dizziness, headaches, lightheadedness" as conditions limiting his ability to work (R. 181). In describing his daily activities, Plaintiff stated that he takes care of his son in terms of getting him from school, making sure his homework is done, and feeding him; he also feeds and waters the family's pet cats with help from his wife (R. 182).

Plaintiff is able to prepare some food for himself, such as sandwiches, frozen pizza, and canned soup, but he no longer cooks regular meals (R. 183). Plaintiff is able to wash dishes as long as he is sitting on a stool, and limits it to fifteen to twenty (15-20) minutes in duration, and can occasionally vacuum. Id. Plaintiff is not able to do yard word; his son mows the yard (R. 184). Plaintiff typically goes outside once per day to get his son from school. Id. Plaintiff is able to shop for groceries approximately once per week for fifteen to twenty (15-20) minutes. Id.

Plaintiff notes that he used to play golf, fish, work, and stand for long periods of time, but is no longer able to do any of those things as he used to (R. 182). Plaintiff has not attempted to play golf because of balance issues, and his fishing is now limited to accompanying his son on short fishing trips (R. 185). The only activity Plaintiff is still able to do is to watch football. Id. His interactions with others socially have also likewise been limited by his conditions (R. 186).

Plaintiff reports the following are affected by his conditions: standing, walking, talking, memory, concentration, understanding (R. 186). He "can't stand very long, ha[s] to stop walking to get [his] bearings, lose attention in conversations, sometimes [he doesn't] understand even though [he] knows what [his] wife is talking about." Id. Plantiff is able to walk maybe a hundred (100) yards before he must stop and rest for one to two (1-2) minutes. Id. Plaintiff notes that

sometimes, his attention span is "not very long," he doesn't always finish tasks, and when following written instructions, has "keep going back rereading even though [he has] done it before." Id. Finally, Plaintiff reports poor coping with stress now, compared to prior to the onset of his conditions (R. 187).

## G.  III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since May 21, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: late effects of cerebral vascular accident (CVA), organic brain syndrome, left eye blindness, obesity, and anxiety (20 CFR 404.1520(c)).

4. Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 40-1520(d), 404.1525 and 404-1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds. He could stand and walk six hours and sit six

hours in an eight-hour workday. He should never climb ladders, ropes, or scaffolds; 01· balance. He could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He has visual limitation of depth perception due to one eye blindness. He should avoid concentrated exposure to extreme cold, extreme heat, wetness, and noise. He should avoid even moderate exposure to vibration, and never be exposed to hazards, such as machinery and heights. He is able to perform simple, repetitive, routine tasks.

6.  The claimant is unable to perform any past relevant work (20 CFR 40-tl 565). Vocational expert, Nancy Shapero testified the claimant's past work as a production worker was semiskilled (SVP3) and performed at medium exertion with no transferrable skills. Accordingly, the claimant is unable to perform past relevant work.

7.  The claimant was born on October 15, 1966, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework support a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (Sec SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(:1)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 21, 2012, through the date of this decision (20 CFR 404.1520(g)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ should have given "controlling weight" to the opinion(s) of Dr. Humphrey since it was well-supported and not inconsistent with the other substantial evidence in the case record. SSR 96-2p. [Exhibits 6F, 8F, 9F].

2. The ALJ failed to provide "good reasons" for discounting the opinion(s) of Dr. Humphrey. SSR 96-2p. [<u>See</u> ALJ decision at 9].

3. The intensity/persistence of claimant's subjective complaints was rejected based solely on objective findings. SSR 96-7p.

4. The substantial evidence of record does not support a finding that the claimant can perform work activities in an ordinary work setting on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week. SSR 968p.

5. The ALJ violated Social Security Ruling 96-8p by failing to consider the effects of the claimant's non-severe physical and mental impairments on his ability to work. SSR 96-8p requires considering the impact of both severe and non-severe impairments on the ability to work.

6. The ALJ's finding that claimant's posttraumatic stress disorder, chronic and major depressive disorder were not severe impairments was not supported by substantial

evidence since the medical evidence of record adequately establishes more than a "minimal effect" on the claimant's ability to work, SSR 85-28; SSR 96-3p.

7. The evidence of record documents that the claimant's impairments meet or equal the requirements of Listing(s) 12.06. 20 C.F.R. §§404.1520(d) and 416.920(d); 20 CFR P. 404, Subpt. P, App. 1.

8. The ALJ failed to obtain an updated opinion on medical equivalence from a medical expert. SSR 96-6p.

9. The ALJ failed to accord adequate weight to the opinion evidence from the Department of Veterans Affairs related to the claimant's service-connected disability. The regulations provide that decisions by other governmental or nongovernmental agencies that a claimant is disabled are not binding on the agency. See 20 C.F.R. § 404.1504. However, SSR 06-03p explains that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." Additionally, the Fourth Circuit has held that in making a disability determination, the Commissioner must give *substantial* weight to a Veterans Affairs disability rating unless the record clearly supports less weight. Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 343 (4th Cir. 2012) (Emphasis added).

10. For all the above reasons the ALJ's decision should be overturned and a new hearing on the merits be had *or* there should be an outright award of benefits as the claimant is disabled under Social Security's rules and regulations. (R. 221-222).

The Commissioner contends:

1. Substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible.

2. The ALJ adequately considered Plaintiff's obesity.

3. Substantial evidence supports the ALJ's finding that Plaintiff did not have a severe impairment of the cervical spine.

4. The ALJ's residual functional capacity finding adequately accounted for his moderate difficulties in maintaining concentration, persistence, or pace. (ECF No. 10).

## C. Credibility Determination

**1. Plaintiff's credibility**

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. §

404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[3] capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

> 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W.

---

[3] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 17). Thus, the Court addresses only Step Two.

Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

Because the conclusions as explained by the ALJ are not supported by the evidence he cites, the Court cannot find that the ALJ has met his basic duty of explanation. That is, the evidence the ALJ cites appears to be consistent with the objective medical evidence, and thus inconsistent with his conclusion. While the evidence cited by the ALJ may be "substantial" in terms of quantity or amount, it is not "substantial" in terms of substance or content.

The Court begins by reiterating that the ALJ found that Plaintiff had satisfied Step One in that Plaintiff does indeed have medically determinable impairments that could reasonably cause the alleged symptoms. SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996). Step One was thus resolved in favor of the Plaintiff.

At Step Two of the credibility analysis, the ALJ found "the claimant's statements regarding intensity, persistence, and limiting effects of these symptoms are not entirely credible," because 1) "allegations of disabling symptoms and limitations are greater than expected in light of the objective clinical evidence and treatment notes," (R. 17) and 2) "daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" (R. 19). Both conclusions lack support and are largely contradicted by the evidence the ALJ cites. The Court thus cannot conclude that the ALJ has met his basic duty of explanation, and even if he had, the Court would have no choice but to consider his conclusion patently wrong based on the evidence cited, and unsupported by substantial evidence.

a. **The ALJ's finding of diminished credibility is not supported by substantial evidence because allegations of disabling symptoms and limitations are *not* contradicted by – and are consistent with – objective clinical evidence and treatment notes.**

Plaintiff argues that "the intensity/persistence of claimant's subjective complaints was rejected based solely on objective findings. SSR 96-7p" (R. 221). More to the point, the ALJ rejected Plaintiff's subjective complaints largely on objective findings that cannot fairly support that conclusion.

The ALJ found that Plaintiff's credibility was diminished by the medical evidence in the record because an MR angiogram showed "no significant changes in Plaintiff's brain since June 2012." Had Plaintiff's brain been in good shape in June 2012, this could have been supportive. However, in June 2012, an MRI showed microvascular ischemic changes in the brain and chronic infarcts in the right cerebellar hemisphere and left cerebellum (R. 249). The subsequent diagnosis was cerebral embolism with cerebral infarction, primary hypercoagulable state, and late effects of cerebrovascular disease (ataxia). (R. 238).

Under the circumstances, the fact that nothing had changed since the June 26, 2012 MRI could not support an inference that Plaintiff was less than credible. The only inference such a statement could logically support is that the underlying medically determinable condition that caused Plaintiff's symptoms in June 2012 still existed. In fact, the findings explicitly state as such.[4] Further, the ALJ's classification of such a state as "normal" is equally puzzling, given those findings.[5] Further, the ALJ cited a portion of the report indicating "no significant stenosis, branch occlusion, aneurysms, or vascular malformation" as further evidence that undermined Plaintiff's credibility regarding his symptoms (R. 231). However, even a cursory reading of the

---

[4] "There is a chronic 20 x 12 mm area of encephalomalacia in the right inferior cerebellum consistent with an old infarct. There is a tiny 3 mm punctuate area of focal volume loss in the left cerebellum that may be a asmall old lacunar infarct. No edema or acute process. These are unchanged since prior study" (R. 233).
[5] Infarcts are indicative of brain tissue necrosis, of which Claimant had at least two, and which were described as "chronic" (i.e., long-term and ongoing).

findings of Dr. Gregory Myers, properly placed in the context of the report, clearly shows that the purpose of the MRI on August 9, 2012, was to determine whether there were any observable *causes* of, or *explanations* for, the chronic infarcts which were documented and indisputably existed in Plaintiff's brain: "No significant abnormalities identified *to explain the right cerebellar infarct.* Consider evaluation of the aortic arch and proximal cervical arteries" (R. 231) [emphasis added].

Further, on August 22, 2012, Dr. Bauerle saw Plaintiff and his assessment was "cerebral embolism; with cerebral infarction, primary hypercoagulable state, and late effects of cerebrovascular disease, ataxia" (R. 238). Dr. Bauerle further noted that:

> The patient's embolic appearing right cerebellar infarct and the left insular collection of smaller infarcts, as seen on MRI, are concerning for a cardiac source of emboli. The history of deep venous thrombosis is suggestive of a hypercoagulable state. Were the patient to have a patent foramen ovale, which occurs in ~ 25% of the population, venous thrombi could cause cerebral infarction. The patient needs a transesophageal echocardiogram, and laboratory workup for thrombophilia and a hematology consultation, as laboratory tests are not available for all hypercoagulable disorders. Many hypercoagulable disorders are familial, so diagnosis of such an issue in one patient can be valuable preventatively for their family members. After the above evaluations, consider MR angiography of the carotid and vertebral arteries . . . Additional studies are necessary to reach an accurate diagnosis. These tests are discussed with the patient.

(R. 238). The ALJ did not discuss the bulk of Dr. Bauerle's findings or notes, which also appear consistent with Plaintiff's statements. Rather, the ALJ briefly mentioned that the results of the echocardiogram were "normal" as supporting Plaintiff's lack of credibility. However, as with above, the ALJ seems to interpret this as negating Plaintiff's claims, rather than what it actually signifies. Dr. Bauerle's notes make clear that the echocardiogram was one of a number of tests he recommended to either confirm or rule out possible *causes* of the brain infarcts that indisputably existed (R. 238). The fact that no cardiac sources of emboli were observed does not change the fact that the infarcts were still present, and still causing Plaintiff's reported issues. It

simply means that possible suspected causes of, or contributors to, those infarcts had been ruled out. Thus, this finding of the ALJ is also not supported by substantial evidence.

Although a cursory review of all of the physicians' notes and medical records pertaining to claims of dizziness, vertigo, and headaches supports an inference that Plaintiff is credible, a few notes and findings appear to have been selectively plucked out of context to support the opposite conclusion – both by the ALJ and by the Commissioner. Whether an innocent mistake or based on a mere lack of understanding rather than purposeful, the selective inclusion of these portions of the record while simultaneously excluding the context of those findings unfairly distorts their objective meaning. In any case, this evidence – taken out of context, contrary to the overall meaning, and cited piecemeal to undermine Plaintiff's credibility – cannot properly support such a finding, not even by a mere scintilla. This evidence clearly can support only an inference that Plaintiff is credible regarding the persistence, intensity, and duration of his symptoms.

The ALJ next cited a "fair response to medication" from Dr. Humphrey, and that "headaches were alleviated with medications and rest" observed by Dr. Levy as, presumably, evidence that contradicts Plaintiff's reports of headaches (R. 18). The Court finds this to be disingenuous as well. Plaintiff reported and testified before the ALJ that he has painful headaches that require pain medication and sleep to resolve. Neither of those quotes from either physician contradict that claim. In fact, all three statements appear to be consistent. Plaintiff's headaches are in fact temporarily alleviated with medications and rest, consistent with Plaintiff's testimony, to the extent that once a headache begins, he must take pain medication and sleep in order to resolve it (R. 37). Plaintiff's headaches are *not* alleviated by medication on more than a temporary basis, as they continue to reoccur on a frequent basis. Id. The ALJ appears to

misinterpret statements indicating that Plaintiff's headaches *eventually go away* after pain medication and two to five hours of sleep, as rather indicating that they are somehow resolved entirely. The Court would also note that Plaintiff was apparently prescribed Vicodin for pain, a significantly stronger pain medication than over-the-counter pain relievers typically used for headaches. (R. 217). In October 2012, Plaintiff's prescriptions included hydrocodone for pain, another maximum-strength prescription pain medicine, in addition to Ibuprofen. (R. 167). Thus, this finding of the ALJ is also without any support, and thus is certainly not supported by substantial evidence.

**b. Plaintiff's daily activities (Factor 1, SSR 96-7p) cannot support a finding of diminished credibility because they are consistent with both Plaintiff's subjective reports and the objective medical evidence.**

The ALJ's rationale regarding Plaintiff's daily activities as undermining Plaintiff's credibility is likewise similarly puzzling. The ALJ found that "Claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." The Court cannot agree.

Plaintiff reported that he was able to 1) was dishes only if he was seated during, and only for 15-20 minutes before he had to stop and rest; 2) make short trips to the grocery store once per week, again limited to 15-20 minutes; 3) prepare basic foods that do not require significant preparation; 4) pick his son up from school; 5) drive to doctor's appointments; 6) go to some football games, and 7) go fishing once per week (R. 184). The ALJ noted that Plaintiff is able to drive still, and goes to football games and goes fishing as evidence contradicting Plaintiff's credibility as to his symptoms.

The Court can find nothing in these statements of daily activities that is inconsistent with Plaintiff's claims, or with the medical evidence in the record. None of those activities require

Plaintiff to stand or otherwise exert himself for more than 15-20 minutes. Presumably, Plaintiff watches football games seated, can adjust positions as necessary during the games he attends, and does not have to stand or exert himself for more than 15-20 minutes. Presumably, Plaintiff is primarily seated while fishing once a week, can adjust positions as necessary while fishing, and does not have to stand or exert himself for more than 15-20 minutes. Presumably, Plaintiff drives in a seated position, and his son's school is not a great distance from their home.

Plaintiff reported that he drives "three or four miles" to Dr. Humphrey's office (R. 41). Plaintiff testified that he drives short distances when necessary, but that he no longer drives to visit family as he used to, and his son drives them to go fishing (R. 43). This is further supported by Plaintiff's testimony that he is hesitant to drive unless absolutely necessary because of his conditions, and has discussed giving up his license altogether with Dr. Humphrey (R. 40). Taken together, this evidence shows that Plaintiff has eliminated driving for anything other than necessary purposes and short distances, and supports an inference of credibility. The Court cannot thus find this evidence supportive of the ALJ's conclusion.

Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (Riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue). See also Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination). Here, Plaintiff reported that his son mows their yard because Plaintiff fell off the riding mower, which is consistent with Plaintiff's statements

regarding dizziness, vertigo, and falls. (R. 263). Plaintiff's reported daily activities are significantly more limited than these.

Lastly, one of Plaintiff's most problematic conditions, dizziness and vertigo, are noted throughout the medical record and his testimony: "I've fallen like 13 or 14 times from it" (R. 37). With regard to Plaintiff's falls and dizziness/vertigo, the ALJ's opinion stated only that "[Plaintiff alleges he has fallen down due to the dizziness, but he was not injured" (R. 17). During the hearing, the ALJ asked Plaintiff "Have any of those falls required you to go to the emergency room?" (R. 38). The Commissioner does not argue, nor is the Court aware of, any requirement that Plaintiff be seriously injured from falls before he can be considered credible. Further, there is evidence in the record to indicate that Plaintiff has largely ceased doing things that are more likely to lead to such a result. Plaintiff reported that he no longer is able to mow the lawn, even using a riding mower, because he fell off it (R. 263). The lack of emergency room visits following a fall cannot be considered substantial evidence to negate Plaintiff's credibility with regard to dizziness and falls.

### c. The evidence cited by the ALJ pertaining to the remaining SSR 96-7p Factors 2-6 cannot support a finding of diminished credibility because it is consistent with both Plaintiff's subjective reports and the objective medical evidence.

The medications a claimant takes is evidence relevant to a credibility determination regarding allegations of pain. Kearse, 73 Fed. Appx. at *603[6] (taking only over-the-counter medications such as Tylenol and Motrin for pain supported finding that pain was not as severe as

---

[6] "In reaching his credibility determination, The ALJ found that although Kearse suffered from impairments that could cause some of the alleged symptoms, the objective medical evidence did not support the alleged severity. An extensive analysis of the objective medical evidence revealed that Kearse did not begin to complain of headaches until after filing his disability applications. Furthermore, there is no objective evidence in the record to support such complaints. Moreover, although Kearse testified that he had to be hospitalized approximately twice a year for such headaches, there is no such supporting documentation contained in the record. Kearse noted several times that he either took no prescription medication, or only samples that he received from the hospital. Instead, the record reveals that he took only Tylenol and Motrin for pain. See Shively, 739 F.2d at 989–90 (upholding the ALJ's finding that claimant's pain was not as severe as he alleged based partly on the prescribed medications of record)."

claimant alleged). Here, the record shows Claimant was prescribed Hydrocodone (R. 167, 260) and Vicodin (R. 236, 282) for pain. Hydrocodone is a prescription-strength Schedule II controlled substance and opioid pain medication designed to treat severe pain.[7] Vicodin is a prescription-strength pain medication comprised of Hydrocodone and Acetaminophen, and designed to treat moderate to moderately severe pain.[8] Thus, the type of medications Plaintiff was prescribed supports Plaintiff's allegations of pain.

Taking only mild pain relievers, in absence of objective medical evidence to support allegations of pain, and in conjunction with daily activities that contradict those allegations, does not support a finding of disability. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (Extra strength Tylenol and extra strength Excedrin, and a prescription analgesic intended for mild to moderate pain, did not sustain pain allegations alone without supporting objective medical evidence). Here, the record does indicate that Plaintiff took Ibuprofen at times.[9] However, Plaintiff's case is clearly distinguished from Shively because 1) based on the record, Plaintiff was also prescribed Hydrocodone and Vicodin; 2) Hydrocodone and Vicodin are designed to treat moderate to severe pain, unlike the prescription analgesic in Shively which was for mild to moderate pain; 3) the ALJ found that Plaintiff's allegations of pain were supported by objective medical evidence and could be caused by his conditions, whereas in Shively they were not; and 4) as discussed at length in this Report and Recommendation, Plaintiff's daily activities are significantly limited and do not contradict his allegations of pain. Thus, in this case, evidence regarding medications could support only an inference that Plaintiff's pain was as severe as he alleged. Plaintiff does not continuously or always take strong prescription pain medicines, but he

---

[7] Zohydro ER (hydrocodone bitartrate) – Drug Summary. Retrieved October 25, 2016 from Physicians' Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Zohydro-ER-hydrocodone-bitartrate-3389.4565
[8] Physicians' Desk Reference 604 (PDR; 69th ed. 2015).
[9] The Court found the word "ibuprofen" three (3) times in Claimant's 318-page record; two of those instances were in medical records from October 2011, *prior* to Claimant's alleged onset date of May 21, 2012 (R. 253, 255).

also does not allege that he is in constant pain; just that his headaches can be very painful when they occur, which appears fully consistent with the medical evidence of record.

The Commissioner and the ALJ both cite the Adult Function Report completed on October 8, 2012 in which Question 22, "Do you currently take any medicines for your illnesses, injuries, or conditions?" has a check mark in the "No" box, presumably as evidence Plaintiff takes no medications (R. 188). "In an Adult Function Report dated October 8, 2012, Plaintiff reported that he was not currently taking any medications" (ECF No. 10 at 5). The Court is not prepared to take that single instance at face value and assume accuracy, as it appears more likely to be an oversight, mistake, or misunderstanding. Plaintiff's medical record shows repeatedly on many other instances that he has been on numerous medications for his conditions, and that those regimens were ongoing. Further, even in the unlikely event that on October 8, 2012 Plaintiff had suddenly ceased all of his numerous medications only to resume them shortly thereafter, the evidence in the record overwhelmingly supports the conclusion he has been taking them for some time, both before and after this anomaly, and continues to take them.

Dr. Levy's report on August 2, 2012 documents Plaintiff was taking his medications at that time (R. 277), as does Dr. Bauerle's report on August 22, 2012 (R. 236). Plaintiff completed online medical forms in which he submitted his list of medications as "currently taking" on January 15, 2013 (R. 192-194), again on February 4, 2013 (R. 199-201). Claimant's Medications Form HA-4632 also listed his full regimen, and that he had been taking most of those medications for years (R. 215). For the numerous instances throughout the record where Plaintiff was documented to be taking his medications, see also R. 253-255 (early to mid-October 2011), R. 260-261 (December 11, 2012), R. 302 (February 17, 2014), Exhibit No. 9F, R. 308-318 (August 13, 2013 through February 11, 2014), including "Matthew Stump's Medication

List and Dates" of eleven different medications prescribed (R. 318). Thus, the Court cannot find one singular instance of a box checked "No" to medications on October 8, 2012 to be significant or even accurate in the face of overwhelming instances in the record, both before and after that date, showing that Plaintiff was taking numerous medications.

This is especially nonsensical because ALJ cited adherence to appropriate medications as prescribed as weighing in Plaintiff's favor. The ALJ also stated that because Plaintiff had never had injections, physical therapy, or surgery, and had *only* been treated with medication, this weighed against Plaintiff. Yet, the Plaintiff testified before the ALJ that no changes to his regimen had ever been suggested to him by his doctors (R. 39). Further, Plaintiff had tried taking medication as prescribed for dizziness/vertigo, but it had not been effective (R. 17). The record also provides no indication that Plaintiff's doctors ever proposed injections or surgery.

The record is unclear on whether Plaintiff has ever had physical therapy. A report from Johnson Chiropractic is included in Plaintiff's medical record, but the extent of Plaintiff's treatment there and whether it involved physical therapy is simply unclear, as it is not uncommon for Chiropractic care to include in-house physical therapy of varying extents (R. 223). However, the records are dated from August 23, 2011 to April 13, 2012, which at minimum supports that Plaintiff's treatment there was ongoing for at least that 8-month period. Thus, as it pertains to Factors 2, 4, 5, and 6 of SSR 96-7p, the Court cannot find substantial evidence in the record to support a credibility determination against the Plaintiff on this issue. The evidence that does exist weighs in Plaintiff's favor.

**2. The ALJ's failure to give controlling weight to Plaintiff's treating physician is not supported by substantial evidence.**

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

*How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will

look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the

patient's condition over a prolonged period of time." <u>Mitchell v. Schweiker</u>, 699 F.2d 185, 187

(4th Cir. 1983). In <u>Craig v. Chater</u>, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not require that a treating physician's testimony "be given
> controlling weight." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact,
> 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the
> > nature and severity of [the] impairment(s) is well supported by
> > medically acceptable clinical and laboratory diagnostic techniques
> > and is not inconsistent with the other substantial evidence in [the]
> > case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical
> evidence or if it is inconsistent with other substantial evidence, it should be
> accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor

the determination of another governmental entity are binding on the Secretary." <u>DeLoatch v.

Heckler</u>, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not

absolute." <u>See</u> <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues

"are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183,

at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a

claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a

medical source that offers an opinion on whether an individual is disabled or unable to work "can

never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL

374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported

by substantial evidence unless the Secretary explicitly indicates the weight given to all of the

relevant evidence." <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure

to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Arnold v. Sec'y of Health, Ed. & Welfare</u>, 567 F.2d 258, 259 (4th Cir. 1977) (quoting <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974)).

### a. Consistency with the Medical Evidence of Record

Here, as discussed at length above, the Court can find no substantial evidence to support the ALJ's findings regarding Dr. Humphrey's credibility, his reports, and conclusions. The ALJ "[gave] little weight to the opinion that the claimant is limited to less than sedentary exertion, as it is not supported by the overall evidence in the treating record including his own treatment records." (R. 20). In support of this assertion, the ALJ noted that treatment notes from Dr. Humphrey "revealed normal to mild findings on examination of the extremities and joints and neurological examination was essentially normal (R. 20) (internal citations omitted)." The Court fails to see how normal to mild findings regarding *extremities and joints* discredits Plaintiff's claims, which have consistently reflected his primary and most problematic impediment to be dizziness and painful headaches associated with stroke.

The ALJ likewise does not elaborate on how findings regarding extremities and joints relate to the herniated and bulging discs in Plaintiff's back. This is especially unclear because the ALJ notes that moderate central spinal stenosis on C4-5 and C5-6 and small protrusions at C5-6 and C6-7 were observed in an MRI from August 2008 (R. 14).[10] In fact, the full report and

---

[10] On Page 1 of records from Health Bridge Imaging, LLC (R. 299, Exhibit No. 7F), the findings from Dr. Gregory Myers are as follows:

> **Findings**: No significant change from the prior exam…
> **C2/3**: Normal.
> **C3/4**: Focal thickening/calcification of the left ligamentum falvum and lavina indenting the left dorsal thecal sac w central canal stenosis. No evidence of neural impingement.
> *C4/5: Congenitally short pedicals combined with mild chronic disc bulge and marginal spurring (greater on the left moderate central canal). There is also moderate to marked left lateral recess and moderate left foraminal stenosis [] the left C5 nerve. If there is a left C5 radiculopathy, this may be clinically relevant.*

findings indicate that is, at minimum, an understatement. The Commissioner likewise cites the 2008 "MRI of [Plaintiff's] cervical spine which . . . [showed] some central spinal canal stenosis but no neural impingement" as supportive of the Commissioner's Motion for Summary Judgment (ECF No. 10 at 3). While neural impingement was not seen at *all* levels, it *was* observed at the C4/5 level affecting the left C5 nerve:

> Impression:
> 1. No significant change from the 2003 exam.
> 2. Central spinal canal stenosis that is moderate at C4/5 and C5/6, mild to moderate at C6/7 and C3/4. There is also moderate left lateral recess and left foraminal narrowing at the C4/5 level *that impinge the left C5 nerve* [emphasis added].
> 3. Chronic small posterior disc protrusions at C5/6 and C6/7.
> 4. Possible right thyroid nodule (vs. partial left thyroidectomy). Recommend thyroid ultrasound.

(R. 299). The record therefore shows that at *some* locations, no neural impingement was observed, but it is *not* true that *no* neural impingement was observed at all, as it was clearly noted at the C4/C5 level. The Commissioner's claim that the MRI showed "no neural impingement" is thus false. If there is any possible alternative interpretation of this evidence that supports the ALJ's findings, it is not explained in the ALJ's decision, nor can the Court intuit one.

The Court is also unclear as to what in Dr. Humphrey's records constitutes an "essentially normal" neurological examination, or how that is inconsistent with these claims, as the ALJ has failed to elaborate. If the ALJ intended that in reference to the transesophageal echocardiogram, this report and recommendation has already discussed the unpersuasive nature of that reasoning at length above. Finding no external inconsistency between Dr. Humphrey's opinion and other medical evidence in the record, the Court next turns to internal consistency.

---

**C5/6**: Chronic small right paracentral disc protrusion combined with short pedicles results in moderate central can[] The disc abuts the right ventral cord.
**C6/7**: Chronic small posterior midline disc protrusion causing mild to moderate central canal stenosis. Moderate [] narrowing. No definite neural impingement.
**C7/T1**: Normal.
[Emphasis added].

A treating physician is not credible when his treatment was infrequent, and his opinion was unsupported by his own treatment notes or other information in the file. Russell v. Comm'r of Soc. Sec., 440 Fed.Appx. 163 (4th Cir. 2011). A treating physician also loses credibility when her testimony is directly contradicted by her own treatment notes. Burch v Apfel, 9 Fed. Appx. 255 (2001) (Treating physician given little credibility when she testified that 1) Claimant was admitted to the hospital for suicidal thoughts, when her notes clearly indicated Claimant's condition was stable and she was not considered harmful to herself or others; 2) Claimant's poor response to medication was not her fault, when treatment notes clearly indicated otherwise – "as usual she had not given the medication adequate time to reach some degree of remission;" 3) Claimant's alcohol consumption did not contribute to her failure to recover, when notes indicated Claimant continued to drink against physician's advice and that it was "not beneficial;" and numerous other contradictions and inconsistencies discussed at length by the ALJ).

Here, the Court can find nothing to contradict Dr. Humphrey's opinions in his own treatment notes, in Plaintiff's testimony, and in the objective medical evidence in the record. In fact, the only evidence that appears to contradict Dr. Humphrey are the opinions of the two medical personnel who reviewed Plaintiff's records for the agency. The ALJ gave "some weight" to the opinions of the State Agency consult physicians, because they "supported their opinions with reference to the available evidence" - a generous characterization.

In fact, psychological consultants Debra Lilly, Ph.D. and G. David Allen, Ph.D., both of whom were not medical doctors but psychologists, found no severe *mental* impairments. However, Plaintiff does not appear to contend that his anxiety and *mental* impairments rendered him disabled alone or equaled a listing; his primary disabling issues are physical - painful

headaches, dizziness and chronic vertigo, and inability to stand or exert himself for more than 15-20 minutes.

The only two agency physicians who appeared to consider Plaintiff's *physical* capabilities were Dominic Graziano, M.D. and Pedro Lo, M.D. The record appears to indicate that these physicians reviewed Plaintiff's medical records alone. There was also no explicit indication either Dr. Graziano or Dr. Lo personally examined Plaintiff (R. 57-58). Further, these opinions were issued in 2012, approximately two years before Dr. Humphrey completed the RFC Questionnaire in 2014.

What is clear is that the extent of Dr. Graziano's support of his opinions with reference to the evidence consists of brief and insubstantial statements with regard to credibility such as "Partially Credible . . . mer does not support degree of alleged impairments" and "Normal mental status does not support his claims of limitations in this domain" (R. 60). If any specific evidence of record persuaded Dr. Graziano to arrive at this conclusion for credibility, he did not elaborate beyond these few exceedingly general statements, nor can the Court intuit what it might be. Dr. Lo was even more brief: "mer in the file reviewed. Affirm [Dr. Graziano's] prior assessment of 11/12/12" (R. 73). Dr. Graziano supported his Residual Functional Capacity findings with "small cva with wide based atalgic gait, mildly unsteady gait, 9/21/2012" which Dr. Lo affirmed verbatim with no additional clarification or comment (R. 61, 72). In short, Dr. Graziano's opinion is supported by a few nonspecific sentences, and Dr. Lo has done little more than add "affirmed" to an already lacking explanation.

Further, even if Dr. Humphrey's opinion was not controlling, numerous relevant factors as to weight are clearly in favor of Dr. Humphrey: examining relationship including frequency, treatment relationship including length (Dr. Humphrey first saw Plaintiff in 2003),

supportability, consistency, specialization, and familiarity. Dr. Humphrey had treated Plaintiff in person for years, was familiar with his history, cited more medical evidence in his Residual Functional Capacity Questionnaire than was included in either agency reviewer's report, provided statements that are not inconsistent with the medical evidence in the record, and his primary specialization, internal medicine, is noted on his physician profile (R. 298). Further, it appears to the Court that records from Drs. Bauerle and Levy are consistent with Dr. Humphrey's opinion.

**b. Opinions Exceeding Area of Expertise or Authority**

The Court is likewise troubled by the weight afforded to various opinions pertaining to mental impairments. The ALJ's conclusion that Dr. Humphrey's "opinion regarding mental impairments is accorded little weight as it is outside his area of expertise" is technically true – Dr. Humphrey is indeed a medical doctor, and not a psychologist. However, it is also internally inconsistent.

Specifically as to mental impairments, Dr. Humphrey circled "anxiety," and opined 1) that Plaintiff's physical and emotional impairments were reasonably consistent with the symptoms and functional limitations described in this evaluation, but that 2) the emotional factors did *not* contribute to the severity of Plaintiff's symptoms and limitations (R. 303). Plaintiff *was* in fact diagnosed with anxiety; that is a statement of fact, supported by the objective medical evidence, which requires no expertise to determine. It is true that Dr. Humphrey noted his personal observations of Plaintiff's nervous and stressed demeanor on the RFC as well. But Dr. Humphrey also indicated that emotional factors played no role in his evaluation of the severity of Plaintiff's symptoms and limitations. Further, because of the way Question 13 is phrased on the RFC, it is impossible to determine how much of Dr. Humphrey's

opinion on mental impairments is attributed to anxiety and emotional factors, and how much is attributed simply to pain.[11] Therefore, the Court is not convinced that Dr. Humphrey *has* in fact ventured outside his area of expertise in arriving at his opinion.

Even if he had, though Dr. Humphrey is not a psychologist, his diagnosis of anxiety *and* Plaintiff's mental impairments (Cognitive Disorder) were both confirmed by a licensed psychologist – Dr. Cynthia Spaulding – whose area of expertise this clearly *is*. Dr. Spaulding further supported her diagnoses with reference to test results and specific symptoms, which is more than can be said for Drs. Lilly and Allen.

The ALJ gave "some weight to the opinions of these State Agency consultant physicians. They supported their opinions with reference to the available evidence" (R. 19). Dr. Lilly's "reference to the available evidence" essentially consists of "cognitive issues . . . are not apparent upon testing. His activities of daily living do not reflect significant difficulties secondary to a mental disorder. Non-severe" and "(R. 59). There is very little specificity as to what evidence in particular supports her conclusions, and Dr. Allen has done little more than simply affirm. Dr. Spaulding's justification, in contrast, is more substantial and specific:

> The diagnosis of Cognitive Disorder, NOS is given based on observing the claimant to have word retrieval difficulties, difficulty recalling details of his personal history, reported symptoms and medical evidence of a prior stroke. The additional diagnosis of Anxiety Disorder, NOS is given based on the claimant reporting panic attacks in which he struggles, to breathe, has chest pain and becomes dizzy.

(R. 263). The Court also notes that Dr. Spaulding further listed Plaintiff's prognosis as "guarded." A guarded prognosis is given when "the outcome of a patient's illness is in doubt"[12] –

---

[11] 13. How often during a typical workday is your patient's experience of *pain or other symptoms* severe enough to interfere with **attention and concentration** needed to perform even simple work tasks? [emphasis added] (R. 303).
      Never    Rarely    Occasionally        Frequently

[12] *Guarded prognosis*, Taber's Cyclopedic Medical Dictionary (22nd ed. 2013).

when medical personnel cannot definitively state whether a patient will successfully recover. If the ALJ considered how much weight to give Dr. Spaulding's opinion, the undersigned was unable to glean that analysis and any conclusion from his opinion.

The Court further does not expressly disagree with the ALJ that Dr. Humphrey's "statement indicating the claimant is disabled or unable to sustain employment, is not a medical opinion, but rather an administrative finding dispositive of a case. These issues are reserved to the Commissioner, and as such are not entitled to any special significant weight (20 CFR 404.1527(e)(1)(2) and 416.927(e)(1)(3))." The Court would note, however, that Dr. Humphrey made both of these statements in response to questions on the Physical Residual Functional Capacity Questionnaire that explicitly solicited his opinion on this exact matter (R. 303).[13]

### 3. Failure to Consider Obesity

The Plaintiff argues that the ALJ failed to consider obesity as required, apart from briefly noting the rules for doing so:

---

[13] On page 2 of the Physical Residual Functional Capacity Questionnaire, Questions 10 through 12 explicitly solicit an opinion from the treating physician on emotional and psychological impairments:

    10. Do emotional factors contribute to the severity of your patient's symptoms and functions limitations?
        Yes     No
    11. Identify any psychological conditions affecting your patient's physical condition:
        Depression
        Somatoform disorder
        Psychological factors affecting physical condition
        Anxiety
        Personality Disorder
        Other: _____
    12. Are your patient's impairments (physical impairments plus any emotional impairments) reasonably consistent with the symptoms and functional limitations described in this evaluation?
        Yes     No     If no, please explain: _____
Question 16 explicitly solicits an opinion from the treating physician as to limitations that affect a Claimant's ability to workt [sic] a regular job on a sustained basis, to which Dr. Humphrey responded in relevant part: "*He is unable to be gainfully employed on a full time basis*" (R. 305) [emphasis added], to which the ALJ objected. The question that immediately follows (Question 17), however, explicitly asks:

    17. *In your expert opinion, do you feel that the patient is capable of working a full-time work schedule at any level of exertion (8 hours per day, 5 days per week)?* [emphasis added]
        Yes     No
The Court can see no qualitative difference between Dr. Humphrey's written response to Question 16 and his circling of "No" on Question 17. The Court observes that this precise opinion is being solicited from a physician, but when he gives it as requested, promptly disregarded by an ALJ as one "reserved for the Commissioner."

> Although obesity is no longer a listed impairment, Social Security Ruling 02-1 p requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. The Clinical Guidelines issued by the National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). We generally will rely upon the judgment of a physician as to whether an individual is obese.

The Commissioner contends that this paragraph is sufficient consideration.

Social Security Ruling 02-01p explains the administration's policy and protocol on the evaluation of obesity. "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281 (September 12, 2002). The ruling recognizes Body Mass Index (BMI) as one of the indicia of an individual's degree of obesity. Id. Social Security Ruling 02-1 provides that at step two of the five step evaluation, obesity may be considered alone or in combination with another medically determinable impairment. At Step Three of the evaluation process, the administrator may find that obesity, either by itself or in combination with other impairments, meets a listed impairment if the obesity is equivalent in severity: "[f]or example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for [the criteria of 1.02A] and we will then make a finding of medical equivalence." Id. at 5.

Under certain circumstances, failure to consider obesity can be harmless error. First, an ALJ's failure to consider obesity is harmless when substantial other evidence exists to support the ALJ's findings. Pritt v. Colvin, citing Prochaska v. Barnhart, 454 F.3d 731, 736-37 (8th Cir. 2006). Second, "Even where an ALJ's decision does not explicitly analyze obesity, the omission may be harmless if the ALJ relied on the opinions of doctors who were aware of the obesity." Cook v. Astrue, 800 F.Supp.2d 897, 907 (N.D.Ill.2011) (citing Prochaska v. Barnhart, 454 F.3d

731, 736–37 (7th Cir. 2006). Additionally, an "ALJ's failure to mention "obesity" is harmless error, where "obesity" was never mentioned at the ALJ hearing and the ALJ thoroughly considered all of Plaintiff's work limitation in his review of the record and Plaintiff's Adult Functioning Report." Pritt v. Comm'r of Soc. Sec., 2014 WL 284499 (N.D. W.Va., January 24, 2014).

Plaintiff's obesity was noted at numerous points in the record, both explicitly as a diagnosis and indirectly by height and weight. Dr. Humphrey noted obesity in October 2011, with a height of five feet seven inches and weight of 267 pounds, which equals a BMI of 41.8 (R. 256). On June 26, 2012, medical personnel noted "technical difficulties" in trying to complete the carotid Doppler ultrasound "due to patient large body habitus" – referring to Plaintiff's large size (R. 251). On December 11, 2012, Plaintiff weighed 292 pounds, a BMI of 45.7 (R. 259). "Obese – 300 lbs" was noted on the Residual Functional Capacity Questionnaire, completed in February 2014. (R. 302). At the hearing, Plaintiff weighed 300 pounds and was five feet eight inches tall, a BMI of 45.6 (R. 14), and testified that he had gained "about 40 pounds" since he left work due to inactivity caused by his medical conditions (R. 34-35).

The Court cannot conclude that the ALJ considered Plaintiff's obesity, since the only mention of obesity in his opinion was in citing the relevant rule. The physicians on whose opinions he primarily relied do not appear to have considered it, either. The ALJ gave some weight to the opinions of Drs. Graziano and Lo, whose explanations were very brief and did not mention obesity once – nor is it apparent that either have ever met Plaintiff in person. The ALJ largely discredited the opinions of Dr. Humphrey, who *was* clearly aware of Plaintiff's obesity given his ongoing in-person treatment of Plaintiff, his use of the term and his documentation of same throughout the record. Lastly, Plaintiff explicitly testified at the hearing before the ALJ

about the amount of weight he had put on since stopping work in 2012 (R. 34-35). Therefore, the Court cannot find that the ALJ thoroughly considered all of Plaintiff's work limitation in his review of the record and Plaintiff's Adult Functioning Report. See Lynch v. Astrue, 2011 WL 7640122 (N.D. W.Va., Oct. 31, 2011), Report and Recommendation adopted sub nom. Lynch v. Comm'r of Soc. Sec. Admin., 2012 WL 1085766 (N.D. W.Va., Mar. 30, 2012) (opinion not supported by substantial evidence when Plaintiff gained approximately 50 pounds after his stroke, and testified regarding obesity at the hearing). Because the ALJ's findings are not supported by substantial evidence, and the doctors on whose opinions he relied did not appear aware, the error cannot be considered harmless.

When appealing the ALJ's decision, the claimant must specify how his obesity (1) limits his functioning and (2) exacerbates his or her own impairments. Moss v. Astrue, No. 2:11cv44, 2012 WL 1435665, at 6 (N.D. W. Va. Apr. 25, 2012) (citing Cook v. Astrue, 800 F. Supp. 2d 897, 907-08 (N.D. Ill. 2011)). However, a Plaintiff is not required to do so "exhaustively," but may do so "generally" in a motion for summary judgment and objections. Pritt v. Comm'r of Soc. Sec., 2014 WL 284499 (N.D. W.Va., January 24, 2014). Here, Plaintiff devoted two pages of his Motion for Judgment on the Pleadings to this issue, which satisfies this obligation. (ECF No. 8 at 11).

### 4. Failure to Consider Disability Determination by the VA

Plaintiff also argues that, although not binding under 20 CFR § 404.1504, an ALJ must still consider a disability determination by the Department of Veterans Affairs ("VA") in his decision. SSR 06-03p ("Evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered"). An ALJ must give "substantial weight" to a VA disability rating, unless the record "clearly demonstrates" that less

weight is appropriate. <u>Bird v. Comm'r of Soc. Sec. Admin</u>, 699 F.3d 337, 343 (4th Cir. 2012).

Here, Plaintiff was determined disabled for the purpose of long-term disability payments from a nongovernmental entity, Guardian Life Insurance Company (R. 137). Plaintiff also asserts the ALJ failed to accord adequate weight to opinion evidence from Veterans Affairs related to a service-connected disability (R. 222). Because there is only a brief mention of the VA disability determination and scant details, the Court is unable to ascertain the date of that determination, whether it was new or existing evidence, or whether any relevant information from same was considered. Since neither the ALJ nor the Commissioner discuss this, the Court assumes that the ALJ either did not consider it at all, or at minimum, failed to explain why it was not given substantial weight. In either case, assuming Plaintiff was determined disabled by the VA, and given that this case must be remanded regardless for lack of substantial evidence, the ALJ should both consider this evidence and either afford it substantial weight, or explain why it should be given less weight.

## VI. CONCLUSION

In summary, because the ALJ's cited evidence and reasons do not support and frequently overtly contradict 1) finding Plaintiff to be less than credible, and 2) failing to afford controlling weight to treating physician Dr. Humphrey, the Court must remand for the ALJ to make new findings regarding credibility of both Plaintiff and treating physician Dr. Humphrey that are sufficiently supported by substantial evidence. Once made, the ALJ must then re-complete all steps in which credibility played any role, using new credibility findings supported by substantial evidence. In addition to Plaintiff's credibility, this also includes affording controlling weight to Plaintiff's treating physician unless the ALJ is able to support less weight with evidence from the record, consistent with a proper analysis of the relevant factors. The ALJ must also likewise

specify and explain the weight afforded to Dr. Spaulding. The ALJ should also consider and explain findings with regard to obesity and any disability determination by the Veteran's Administration, to the extent the Plaintiff documents it.

## VI. RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this matter be **REMANDED** for the reasons stated forth within.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 16th day of November, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE